RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0420P (6th Cir.)
File Name: 00a0420p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CHRISTOPHER J. PARRY,
   *Plaintiff-Appellant,*

   *v.*

MOHAWK MOTORS OF
MICHIGAN, INC.;
AUSTINTOWN AMBULATORY
ER; MEDEXPRESS; DRUG
FREE, INC.,
   *Defendants-Appellees,*

ARNOLD J. PRITCHARD; APIC;
DIVERSIFIED CONTRACT
SERVICES, INC.,
   *Defendants.*

No. 99-3924

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00179—John M. Manos, District Judge.

Argued: September 15, 2000

Decided and Filed: December 29, 2000

Before: JONES, SILER, and CLAY, Circuit Judges.

---

### COUNSEL

**ARGUED:** Natalie F. Grubb, Medina, Ohio, for Appellant. Laura J. Avery, REMINGER & REMINGER, Cleveland, Ohio, Douglas G. Leak, BONEZZI, SWITZER, MURPHY & POLITO, Cleveland, Ohio, D. Faye Caldwell, CALDWELL & CLINTON, Houston, Texas, Kathryn M. Miley, WILKERSON & ASSOCIATES, Cleveland, Ohio, for Appellees.    Joseph Black, CULLEN LAW FIRM, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Natalie F. Grubb, Medina, Ohio, for Appellant.  Richard C. Haber, REMINGER & REMINGER, Cleveland, Ohio, Steven J. Hupp, BONEZZI, SWITZER, MURPHY & POLITO, Cleveland, Ohio, D. Faye Caldwell, CALDWELL & CLINTON, Houston, Texas, Francis Daniel Balmert, VORYS, SATER, SEYMOUR & PEASE, Cleveland, Ohio, Kathryn M. Miley, Ernest L. Wilkerson, Jr., WILKERSON & ASSOCIATES, Cleveland, Ohio, for Appellees.  Paul D. Cullen, Sr., Diana E. Stein, CULLEN LAW FIRM, Washington, D.C., for Amicus Curiae.

---

### OPINION

---

CLAY, Circuit Judge. Plaintiff, Christopher J. Parry, appeals from the district court's order granting summary judgment to Defendants, Mohawk Motors ("Mohawk"), Austintown Ambulatory ER ("Austintown"), MedExpress, and Drug Free, Inc. ("Drug Free") and denying Plaintiff's motion to file a second amended complaint. Plaintiff claims that the district court erred by (1) denying him leave to amend his complaint to include a *Bivens* claim; (2) concluding that he did not have a private cause of action under the regulations promulgated pursuant to the Federal Omnibus Transportation Employee Testing Act of 1991 ("FOTETA"), 49 U.S.C. § 31306; (3) concluding that he was not wrongfully terminated under the Americans with Disabilities Act, 42

U.S.C. § 12101 ("ADA") and Ohio public policy; and (4) concluding that he did not have a cause of action under Ohio state law for defamation or invasion of privacy. Moreover, Plaintiff claims that the district court erred in granting summary judgment to Defendants Mohawk, Drug Free, MedExpress and Austintown while at the same time imposing a stay under the Bankruptcy Code in Plaintiff's case against Defendants Pritchard and APIC. For the reasons stated below, this Court **AFFIRMS** the district court's orders granting summary judgment and denying Plaintiff's motion to file a second amended complaint.

## BACKGROUND

On July 11, 1996, Plaintiff signed a contract with Defendant Arnold J. Pritchard and Pritchard's company, Defendant APIC, to drive on their behalf. Defendant Pritchard leased drivers and trucks to Defendant Mohawk. Mohawk acted as the carrier and dispatched leased drivers for particular runs. Defendant Pritchard signed an agreement with Mohawk stating that his drivers would participate in a drug testing program as mandated by federal law.

On August 6, 1997, Plaintiff was selected for a random drug test. Plaintiff received instructions to proceed to a terminal in Lordstown, Ohio because that location was the most convenient. At the Lordstown terminal, Plaintiff was given a Federal Drug Testing Custody and Control Form ("CCF") and a testing kit. Plaintiff was then instructed to drive to Defendant Austintown, a clinic and emergency room, for collection of his specimen.

Wendy Carter, a technician for Austintown, supervised Plaintiff's urine collection. The CCF indicates that the collection process began at 12:15 p.m. on August 6, 1997. Initially, Carter indicated that the temperature of Plaintiff's specimen was "in range." However, she testified during her deposition that Plaintiff's specimen "felt hot." Pursuant to instructions from her supervisor, she took the temperature of Plaintiff and his specimen. Carter's notes indicate that Plaintiff's body temperature was 98.2 degrees Fahrenheit

while Plaintiff's urine specimen was 104.6 degrees Fahrenheit. Additionally, Carter determined that the specific gravity of the specimen was about 1.0, indicating that the specimen was too clear for normal urine.

Although the specimen temperature did not match Plaintiff's body temperature, Carter sealed and boxed the specimen to ship to the laboratory for testing. She testified that her notes were written down after the specimen was boxed. By this time, Plaintiff had been given a copy of the CCF. In addition, three copies of the CCF were sealed in the box with the specimen. Carter altered the copies of the CCF to indicate that the specimen was not within the proper temperature range. Because various carbon pages had already been separated, the alteration did not appear on all copies. Carter stated that she initially indicated a normal temperature on the CCF because she had never encountered an abnormal specimen before and assumed that Plaintiff's specimen would be normal as well.

After the collection, Plaintiff was taken to an alcohol technician for an alcohol breath test. Carter testified that she told both the alcohol technician and Plaintiff that he could not leave because another urine specimen was required in light of the temperature and specific gravity readings of Plaintiff's earlier specimen. Plaintiff testified that during the course of events, "[he] knew [he] had to stay at the facility." (J.A. at 627.) After the alcohol test, Plaintiff was escorted to the waiting area near the reception desk.

At approximately 12:50 p.m., Carter went into the reception area and observed Plaintiff re-entering Austintown from the outer doors of the emergency room. She had a conversation with Plaintiff in which she explained to Plaintiff that he could not give a second specimen because he had left the facility. Although Carter's notes indicate two specimens were taken and the second was observed by a doctor, the notes also indicate that Plaintiff left before the second specimen could be taken. Carter explained the discrepancy by stating that the initial statement was written down based on Plaintiff's

## CONCLUSION

Inasmuch as Plaintiff has failed to show that his claims have any basis whatsoever in fact or law, we hold that the district court properly concluded that Defendants were entitled to judgment as a matter of law on each of Plaintiff's claims. We further hold that the district court did not err in denying Plaintiff's motion to file a second-amended complaint. Accordingly, this Court **AFFIRMS** the district court's orders granting summary judgment to Defendants and denying Plaintiff's motion to file an amended complaint.

district court extend the automatic stay to the solvent co-defendant companies. Specifically, Plaintiff argues that a contractual relationship existed between the co-defendants, i.e., Defendant Pritchard leased trucks and drivers to Mohawk and Mohawk contracted with MedExpress, Austintown and Drug Free to conduct the drug testing, which warrants the extension of the stay to all defendants in the case.

A petition filed for bankruptcy operates as a stay and is applicable to the continuation of a judicial proceeding against the debtor. *See* 11 U.S.C. § 362(a)(1). The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a)(1) stays an "action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ."

Extending a stay to nonbankrupt co-defendants is justified only in "unusual circumstances." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992). In *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993), this Court recognized that absent unusual circumstances the stay "does not extend . . . to separate legal entities such as corporate affiliates, partners in debtor partnerships, or to codefendants in pending litigation." In this case, Plaintiff has failed to demonstrate that "unusual circumstances" warrant the extension of the automatic stay beyond Defendants Pritchard and APIC to the remaining solvent co-defendants. Although Plaintiff alleges that a contractual agency relationship existed between Defendants, he cites no authority for the proposition that an agency relationship warrants the extension of an automatic stay. In light of this Court's decision in *Patton* and Plaintiff's failure to show that unusual circumstances exist to warrant the extension of a stay, we find that Plaintiff's contention is without merit and that the district court properly granted summary judgment to Defendants despite the automatic stay imposed as to Plaintiff's case against Defendants Pritchard and APIC.

agreement to give a second specimen. He left the facility, however, before she or a doctor actually had an opportunity to take the second specimen.

Subsequently, Plaintiff made a phone call to Defendant Pritchard for instructions and spoke to Pritchard's wife. After the call, pursuant to Plaintiff's employer's instructions, Carter was directed to send the first specimen for testing. Plaintiff's phone call and Pritchard's instruction are reflected in Carter's notes. Plaintiff then left Austintown.

At approximately 2:05 p.m., Plaintiff returned to Austintown again with the intention of giving a second specimen. Carter instructed him to wait while she determined whether he could give a second specimen. She contacted Linda Campbell of Central Transport. Campbell informed Carter that because he had left the facility, a second specimen could not be taken because under the regulations, leaving constituted a "refusal to test." Campbell then advised her supervisor, Randall Fields, that there was a problem with Plaintiff's drug test. In a subsequent conference call between Carter and Fields and/or Campbell, Campbell reiterated that a second sample could not be taken. They instructed Carter to send the original specimen and explained to Plaintiff that he should contact Defendant Pritchard for further instructions.

On August 7, 1997, MedExpress received and tested Plaintiff's urine specimen for drugs. The specimen was also tested for specific gravity and creatine level. The specimen tested negative for drugs, but had a specific gravity and creatine level below that required by the regulations. Although this did not mean that a driver was disqualified, it did mean that a driver could be required to give an "observed" specimen in a subsequent test. The results were reported to Defendant Drug Free, the Medical Review Officer ("MRO"), for review.

Drug Free received the results on August 7 or 8, 1997. Dr. James Haber, an employee of Drug Free was the physician who acted as the MRO for Plaintiff's case. He testified at his deposition that negative results ordinarily receive an

administrative review. Negative results are also not discussed with the employer. Dr. Haber only recalled discussing the results with David Eades, the president of Drug Free.

Eades testified at deposition that the motor carrier is notified of a low specific gravity or creatine level even if the tests are negative. The reporting is necessary to permit the employer to require an observed specimen in subsequent tests. Eades also testified that he has discussed negative results with employers when problems with the collection process were brought to his attention.

Fields and Campbell contacted Eades within days of Plaintiff's test. They were concerned about whether it was proper to send a "hot" specimen out for testing. Eades explained that all specimens, regardless of temperature, must be tested under federal regulations. They also inquired as to the ramification of the low specific gravity and creatine level. Eades further explained that this did not result in disqualification, but the employer had the option of requiring an observed specimen in subsequent tests. Eades instructed his employees to look into the matter further; the employees in turn contacted Austintown and MedExpress for their version of events. Between August 13 and 18, 1997, the parties faxed information to each other surrounding the circumstances of Plaintiff's drug test.

Carter testified that any subsequent inquiries about Plaintiff were referred to Fields. Other than these referrals, she did not have any substantive discussions with anyone about Plaintiff. Fields and Campbell testified that they did not talk about Plaintiff to others.

Plaintiff no longer drives for Pritchard or Mohawk. Plaintiff was terminated because he allegedly took Defendant Pritchard's tractor across state lines without permission. When other truck owners and operators made inquiries, Fields and Campbell responded by providing only general information about Plaintiff, including his employment dates, whether there was a positive result in previous drug tests, and the last date of his test.

In the instant case, Plaintiff proceeds under the cause of action that allows one to recover for the public disclosure of private facts. In order to recover under this theory, a plaintiff must demonstrate that there was: "(1) a clearly private fact; (2) public disclosure of the private fact; and (3) a showing that the matter made public is one which would be highly offensive and objectionable to a reasonable person." *Greenwood v. Taft, Stettinius & Hollister*, 663 N.E.2d 1030, 1035 (Ohio Ct. App. 1995). "Publicity" means "communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' [as used in defamation cases and] meaning any communication by the defendant to a third person." *Seta v. Reading Rock Inc.*, 654 N.E.2d 1061, 1068 (Ohio Ct. App. 1995) (citation and quotation omitted).

On appeal, Plaintiff merely argues that a reasonable person would object to being accused of adulterating his specimen, refusing to test, or being disqualified for allegedly failing to follow procedures. Plaintiff also contends that a reasonable person would object to specific gravity and creatine levels being made public. Aside from Plaintiff's failure to cite any authority in support of his claim, he has failed to demonstrate that the circumstances surrounding his drug test were communicated "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* at 1068. As a result, Plaintiff cannot sustain a cause of action for invasion of privacy. Accordingly, the district court properly granted summary judgment.

### 4. The District Court's Imposition of an Automatic Stay as to Defendants Pritchard and APIC

Finally, Plaintiff contends that the district court erred by granting summary judgment to Defendants because the automatic stay provisions of the Bankruptcy Code suspended Plaintiff's lawsuit against Defendants Pritchard and APIC. Plaintiff argues that unusual circumstances require that the

to prospective employers.[6]   However, the evidence in the record demonstrates otherwise.  The prospective employers essentially stated that they could not hire Plaintiff because of his problems with his drug test.  None of the prospective employers stated that they were ever told that Plaintiff had tested positive for drugs.  Likewise, Plaintiff cannot point to any facts demonstrating that any prospective employer stated that Plaintiff tested positive for drugs or otherwise made or were told false statements regarding Plaintiff's test.  Plaintiff has not demonstrated that any of the alleged statements were false.  Therefore, Plaintiff cannot sustain a defamation claim because he has failed to raise a genuine issue of material fact such that a reasonable jury could find for Plaintiff; and, the district court properly granted summary judgment on this claim.

### b.  Invasion of Privacy

Ohio law recognizes a cause of action for the invasion of privacy in cases where there is 1) the unwarranted appropriation or exploitation of one's personality; 2) the publicizing of one's private affairs with which the public has no legitimate concern; or 3) the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. *See Jackson v. City of Columbus*, 194 F.3d 737, 755 (6th Cir. 1999).

---

[6]Defendant MedExpress was legally obligated to provide the quantitation at the request of the designated MRO.

    The Medical Review Officer may request from the laboratory and the laboratory shall provide quantitation of test results. The MRO shall report whether the test is positive or negative, and may report the drug(s) for which there was a positive test, but shall not disclose the quantitation of test results to the employer. Provided, that the MRO may reveal the quantitation of a positive test result to the employer, the employee, or the decisionmaker in a lawsuit, grievance, or other proceeding initiated by or on behalf of the employee and arising from a verified positive drug test.

49 C.F.R. § 40.29

---

Plaintiff commenced this action on January 27, 1998.  On April 16, 1998, Mohawk filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). On August 8, 1998, Mohawk converted its motion to dismiss into a motion for summary judgment pursuant to Federal Rule Civil Procedure 56.  On June 4, 1998, MedExpress filed a motion for summary judgment. Drug Free and Austintown filed motions for summary judgment on July 21 and 31, 1998, respectively.

The district court conducted a pre-trial conference on August 4, 1998, where it suspended discovery and indefinitely postponed the trial pending its ruling on the dispositive motions.  On September 9, 1998, Defendants Pritchard and APIC filed notice of Chapter 7 Bankruptcy.

On September 16, 1998, Plaintiff filed his first amended complaint.   On September 28, 1998, Plaintiff filed a combined response to Defendants' motions for summary judgment. The district court granted summary judgment to all Defendants and stayed the proceedings as to Defendants Pritchard and APIC pursuant to the automatic stay provisions of the Bankruptcy Code on March 25, 1999.  Plaintiff filed a motion for reconsideration on April 15, 1999.  The district court denied Plaintiff's motion for reconsideration on April 26, 1999. Thereafter, Plaintiff filed a motion for leave to file a second amended complaint on June 8, 1999.  The district court denied Plaintiff's motion on June 18, 1999. On July 15, 1999, Plaintiff filed a motion to certify the interlocutory grant of summary judgment for appeal to this Court.

### DISCUSSION

### I.

### A.  Standard of Review

We generally review a district court's denial of a motion to amend a complaint for abuse of discretion. *See United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995).  However, when the district court's decision is based on a legal conclusion that the proposed amendment would be

futile, we review the denial of the motion to amend *de novo*. *See Hahn v. Star Bank*, 190 F.3d 708, 715-16 (6th Cir. 1999). In the instant case, the district court denied Plaintiff's motion to amend on the ground that it was untimely, prejudicial and futile. We will therefore review the district court's decision for abuse of discretion except to the extent it held that Plaintiff's amendment would be futile, which we review *de novo*.

### B. Analysis

Plaintiff argues that the district court erred by denying his motion to file a second amended complaint. In his proposed second amended complaint Plaintiff sought to add a claim under *Bivens*.[1] We hold that the district court properly denied Plaintiff's motion to amend his complaint.

Federal Rule of Civil Procedure 15(a) provides that a district court shall freely grant leave to amend a complaint when justice so requires. *See* FED. R. CIV. P. 15(a). Nevertheless, the party requesting leave to amend must "act with due diligence if it wants to take advantage of the Rule's liberality." *Midwest Suspension & Brake*, 49 F.3d at 1202.

At the outset, we note that Plaintiff's June 8, 1999 motion to amend his complaint came almost nine months after he filed his first amended complaint and well over a year after he filed his original complaint. Moreover, at the time Plaintiff filed his motion to amend, the district court had granted summary judgment to Defendants two and one-half months earlier as well as denied Plaintiff's motion for reconsideration.

Plaintiff in the instant case argues that a § 1983 claim, raised in his original complaint but deleted from his first

---

[1] A *Bivens* action is an action for damages arising out of a violation of one's federal constitutional rights by another acting under color of federal law. *See Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

test. Therefore, the statement does not constitute a "false" statement and cannot rise to the level of defamation.

In addition, even if Defendants' statements were defamatory, we conclude that they are qualifiedly privileged under Ohio law. Under Ohio law,

> "A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interest of society that he should tell third person certain facts, which he in good faith proceeds to do."

*Miller v. Ohio Rehab. Servs. Comm'n*, 685 N.E.2d 616, 618 (Ohio Ct. Cl. 1997) (quoting 17 Ruling Case Law, 341). To overcome this privilege, Plaintiff must produce sufficient proof of actual malice. *See id.* at 619. We believe that Defendants' statements, which consisted of conference calls and fax transmissions amongst the defendant companies involved in the federally-mandated testing of Plaintiff's urine specimen, are qualifiedly privileged because they occurred during the regular course of Defendants' duties in administering drug tests and were reasonably necessary to determine what should be done regarding Plaintiff's drug testing results, the events surrounding his first urine specimen, and whether he should give a second urine sample. We further conclude that Plaintiff has failed to produce evidence of actual malice to overcome the privilege accorded these communications.

Plaintiff also contends that Defendants engaged in defamation by relating information surrounding his drug tests

the district court concluded that the statements exchanged surrounding Plaintiff's drug test were not false. This Court agrees.

To state a claim under Ohio law for defamation, the plaintiff must show that there was: 1) a false statement, 2) defamatory to the plaintiff, 3) published to a third party, 4) by a defendant who was at least negligent, and 5) damaging to the plaintiff's reputation. *See Lansdowne v. Beacon Journal Publ'g Co.*, 512 N.E.2d 979, 984 (Ohio 1987). A plaintiff must prove a defendant's negligence by clear and convincing evidence, but need only prove the other elements by a preponderance of the evidence. *See id.* at 984. In a defamation action, falsity is an essential element. *See Bruss v. Vindicator Printing Co.*, 672 N.E.2d 238, 240 (Ohio. Ct. App. 1996). Furthermore, in defending against a defamation action, it is sufficient for the defendant to show that "the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation." *Nat'l Medic Servs. Corp. v. E.W. Scripps Co.*, 573 N.E.2d 1148, 1150 (Ohio Ct. App. 1989).

Here, Plaintiff contends that Defendant Mohawk's characterization of Plaintiff as "immediately disqualified," once Mohawk became aware of the circumstances surrounding his drug test, amounted to defamation. Specifically, Plaintiff points to Mohawk pulling his card from the wall of dispatchable drivers. Although it was probably more accurate to characterize Plaintiff's status as a "refusal to test," this Court nevertheless concludes that the statement does not constitute a "false" statement because in defending against a defamation action, it is sufficient for the defendant to show that "the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation." *Id.* at 1148. Here, the "gist" of the statement was that Plaintiff had not properly taken the drug

---

submitting a second urine specimen.

---

amended complaint, was similar to the *Bivens* claim that he now wishes to assert inasmuch as the § 1983 claim alleged a "constitutional" claim in a "general sense." He argues that this similarity affords Defendants sufficient and fair notice. Plaintiff's argument is flawed for two reasons. First, the §1983 claim alleged in Plaintiff's original complaint arose from Defendant Pritchard's purported filing of a false police report in which Pritchard accused Plaintiff of stealing Pritchard's truck by driving it across state lines to New York. The facts underlying the § 1983 claim are not the basis for his *Bivens* claim, which arose from the administration of his drug test. Thus, Plaintiff's argument that the two actions are similar enough to provide Defendants sufficient and fair notice is artful, but unpersuasive. Second, Plaintiff's first amended complaint, not his original complaint, was the legally operative complaint for purposes of his motion to amend. *See In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) (when plaintiff files amended complaint, new complaint supersedes all previous complaints and controls case from that point forward); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) (same). Therefore, Plaintiff is effectively attempting to add a new legal theory after the grant of summary judgment and denial of his motion for reconsideration. We therefore conclude that Defendants did not have fair notice of the *Bivens* claim and would be prejudiced by the addition of this new legal theory nine months after the filing of the first amended complaint. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (allowing amendment would create prejudice to defendants in having to reopen discovery and prepare a defense for a claim quite different from sex-based retaliation claim that was before the court); *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989).

Moreover, we agree with the district court that Plaintiff's amendment would be futile inasmuch as he has not stated a claim under *Bivens*. This Court has previously determined that a *Bivens* claim, under appropriate circumstances, may be brought against a private corporation that engages in federal action. *See Hammons v. Norfolk S. Corp.*, 156 F.3d 701, 704

(6th Cir. 1998); *see also Malesko v. Correctional Servs. Corp.*, 229 F.3d 374, 2000 WL 1483346, *5-7 (2d Cir. Oct. 06, 2000) (citing *Hammons, supra*). Nevertheless, in order to state a claim under *Bivens*, Plaintiff must allege that there was federal action in contravention of a constitutional right. *See Hammons*, 156 F.3d at 704. We do not decide whether Defendants' actions constitute federal action for purposes of a *Bivens* claim because, even assuming that they did, Plaintiff has failed to allege and we do not believe that Plaintiff can allege and prove a violation of his constitutional rights. Although Plaintiff has not alleged a violation of any specific constitutional right, this Court assumes, based on the facts, that Plaintiff would argue that his Fourth Amendment right against unreasonable searches was violated by the random drug test that he was required to take. Under the circumstances of this case, where Plaintiff, who occupies a safety sensitive position, was randomly chosen pursuant to federal regulations to take a single drug test and there is no showing of abuse of that process, we would not find a Fourth Amendment violation. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) (holding that random, systematically applied drug tests conducted under federal regulations to ensure safety did not violate Fourth Amendment prohibition against unreasonable searches); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (same); *Drake v. Delta Air Lines, Inc.*, 147 F.3d 169 (2d Cir. 1998).

Therefore, we conclude that the district court properly denied Plaintiff's motion to amend his complaint.

## II.

### A. Standard of Review

We review the district court's order granting summary judgment *de novo*. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). "The mere existence of a

because of a perceived drug use, his termination constituted a violation of Ohio public policy. Although there appears to be an express public policy prohibiting discrimination against disabled individuals, *see* Ohio Rev. Code Ann. § 4112.02 (substantially similar to the ADA), Plaintiff, having failed to show a viable claim under the ADA, is necessarily precluded from claiming that his termination violated Ohio public policy. *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 939-40 (6th Cir. 2000).

Plaintiff's argument that a violation of 49 U.S.C. § 31306 contravenes Ohio public policy is equally without merit. Section 31306 was enacted to prevent accidents and injuries resulting from the use of controlled substances and the misuse of alcohol. *See* 49 C.F.R. § 382.101. There is no indication under Ohio law, either through a pronouncement of the Ohio courts or a statute, that a violation of the procedures outlined in § 31306 resulting in the termination of a transportation employee runs afoul of Ohio public policy. We further conclude that Plaintiff failed to present evidence to support a violation of § 31306 or that he was terminated as a result of a violation of § 31306. Consequently, we conclude that Plaintiff cannot rely on § 31306 to support a claim in tort for a violation of Ohio public policy. Therefore, the district court did not err in granting summary judgment on this claim.

### 3. Plaintiff's State Law Claims

### a. Defamation

Plaintiff also argues that the district court erred in granting summary judgment on Plaintiff's defamation claim against Defendants. Plaintiff argues that the information that was exchanged between Defendants, surrounding the circumstances of his drug test, constituted a false publication amounting to defamation.[5] In dismissing Plaintiff's claim,

---

[5] A series of communications including conference calls and fax transmissions occurred between Defendants in an effort to ascertain what should be done in light of Plaintiff having left the facility before

(1981),[4] and, therefore, conclude that the district court properly granted summary judgment as to Plaintiff's ADA claim.

### b. Ohio Public Policy

Generally, in order to succeed on a wrongful discharge claim in violation of public policy under Ohio law, a plaintiff must show that (1) a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law;" (2) that "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy;" (3) "[t]he plaintiff's dismissal was motivated by conduct related to the public policy;" and (4) "[t]he employer lacked overriding legitimate business justification for the dismissal." *Painter v. Graley*, 639 N.E.2d 51, 57 n.8 (Ohio 1994). Absent an Ohio statute expressing Ohio public policy, whether a clear public policy exists is to be determined by the courts of the state of Ohio. *See id.* at 56.

Plaintiff argues that Defendants violated the ADA and 49 U.S.C. § 31306, thereby violating Ohio public policy. As to the ADA, Plaintiff argues that since he was terminated

---

[4] However, were we to engage in the burden-shifting analysis, we would still conclude that Plaintiff has failed to state a claim under the ADA sufficient to avoid summary judgment. Under the burden-shifting analysis, if Plaintiff had established a *prima case* of discrimination under the ADA, the burden would then shift to Defendants to produce a legitimate nondiscriminatory reason for Plaintiff's termination. *See Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000). In the instant case, Plaintiff was terminated because he allegedly took his employer's truck and drove it across state lines without his employer's permission. Defendant having proffered a legitimate nondiscriminatory reason for Plaintiff's termination, Plaintiff must establish that the proffered reason is merely a pretext for discrimination. *See id.* We conclude that Plaintiff has not met this burden. Plaintiff has failed to put forth any evidence showing that the stated reason for his termination was merely pretextual. Therefore, even assuming arguendo Plaintiff could have established a *prima facie* case, we conclude that Plaintiff's claim under the ADA would nevertheless fail.

---

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. Analysis

### 1. Plaintiff's Claim Under the FOTETA

On appeal, Plaintiff argues that the district court erred when it concluded that Plaintiff did not have an implied private cause of action pursuant to 49 C.F.R. § 40.25, a regulation promulgated under FOTETA. This Court holds that the district court properly analyzed Plaintiff's claim and properly concluded that an implied private cause of action does not exist under 49 C.F.R. § 40.25 or FOTETA.

The regulation upon which Plaintiff relies reads in pertinent part:

> The employee may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling or analysis of the specimen or to indemnify any person for the negligence of others.

49 C.F.R. § 40.25 (f)(22)(ii). The statute under which the regulation was promulgated, FOTETA, provides that the Secretary of Transportation shall prescribe regulations to establish drug testing programs "[i]n the interest of commercial motor vehicle safety." 49 U.S.C. § 31306. In addition, the regulations provide that "[t]he purpose . . . is to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles." 49 C.F.R. § 382.101.

In *Cort v. Ash*, 422 U.S. 66, 78 (1975), the Supreme Court articulated a four-part test to determine whether an implied right of action exists in a federal statute. The four-part test established in *Cort* requires that the court consider:

(1) whether plaintiffs are among the class of persons intended to benefit from the enactment of the statute; (2) whether there is any evidence of legislative intent to provide or deny a private remedy; (3) whether a private remedy would be consistent with the underlying purposes of the legislative scheme; and (4) whether the action is one traditionally delegated to state law so it would be inappropriate to imply a federal remedy. 422 U.S. at 78. Since the issuance of *Cort*, however, the Supreme Court has refined this inquiry and the focal point is whether Congress, expressly or by implication, intended to create a private cause of action. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15-16 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979); *see also Thompson v. Thompson*, 484 U.S. 174, 189 (1988) (Scalia, J., concurring) ("[W]e effectively overruled the *Cort v. Ash* analysis in *Touche Ross* . . . and *Transamerica* . . ., converting one of its four factors (congressional intent) into the determinative factor."). The other *Cort* factors are relevant insofar as they assist in determining congressional intent. *See Touche Ross*, 442 U.S. at 575-76.

Defendants rely upon *Salomon v. Roche Compuchem Laboratories, Inc.*, 909 F.Supp 126 (E.D.N.Y. 1995) in support of their claim that § 40.25(f)(22)(ii) does not provide for a private cause of action. In *Salomon*, the plaintiff was a flight attendant for American Airlines and brought suit alleging that the defendant violated 49 C.F.R. § 40.37, the regulation governing employee access to drug testing records. The district court concluded that the statute was framed as a general mandate to the Federal Aviation Administration to establish drug testing regulations, not to address the concerns of a specific class of persons. *See id.* at 128. Other courts have similarly concluded that the regulations promulgated under 49 C.F.R. Part 40 do not provide for a private cause of action. *See, e.g., Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 170-71 (2d Cir. 1998) ( affirming district court's conclusion that plaintiff did not have a private cause of action under 49 C.F.R. Part 40); *Schmeling v. NORDAM*, 97 F.3d 1336, 1343-44 (10th Cir. 1996) (concluding that 49 C.F.R. § 40.35 did not

substantially limit a major life activity of the employee. *See* 42 U.S.C. § 12102(2); *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 611 (10th Cir. 1998); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (acknowledging that to prevail on a perceived disability claim, a "plaintiff must show that the perceived impairment is a substantial limitation on a major life activity").

The term "'substantially limits' means an inability to perform or a significant restriction on the ability to perform as compared to the average person in the general population." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir. 1998) (citing 29 C.F.R. § 1630.2(j)(1)). "'Major life activities' include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Id*. (quoting 29 C.F.R. § 1630.2(i)).

Plaintiff has failed to allege any evidence that would lead a reasonable jury to conclude that Defendants regarded or "perceived" him as having a substantially limiting disability—a drug addiction. Specifically, Plaintiff has failed to produce any evidence that Defendants believed he was illegally using drugs to the extent that one or more of his major life activities were substantially limited. Plaintiff's contention, absent any evidence, amounts to the mere conjecture that he was fired because Defendants perceived him as having a drug addiction. Therefore, Plaintiff has failed to show that he is perceived as having a "disability" as defined under the ADA. Moreover, we conclude that Plaintiff has not produced any evidence to show that he was replaced by a person who was not disabled. Having failed to establish to all the elements of a *prima facie* case, we do not consider the burden-shifting analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254-56

burden shifts to the employer to articulate a nondiscriminatory legitimate reason for the termination. *See id.* Provided that the employer meets this burden, Plaintiff must then show that the proffered reason is but a pretext for discrimination. *See id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). We conclude that Plaintiff's ADA claim must fail because he cannot establish a *prima facie* case.

To establish a *prima facie* case, Plaintiff must show that (1) he was "disabled" under the ADA, (2) he was otherwise qualified to perform the essential functions of the job; (3) he suffered adverse employment action; and (4) he was replaced by a nondisabled person. *See Martin*, 209 F.3d at 934. We find that Plaintiff has failed to establish the first and fourth elements of a *prima facie* case.

First, Plaintiff has failed to establish that he was or is "disabled" under the ADA. Under the ADA, a disability is defined as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff contends that he was administered a random drug test because his employer perceived him to be a drug user. The ADA provides protection for employees who are erroneously regarded as current illegal drug users. *See* 42 U.S.C. § 12114(b)(3) (excluding erroneous perception of illegal drug use from being disallowed as a disability under § 12114(a)); *Buckley v. Consol. Edison Co. of New York, Inc.*, 127 F.3d 270, 273 (2d Cir. 1997), *vacated en banc on other grounds*, 155 F.3d 150 (2d Cir. 1998); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 831-32 (9th Cir. 1995). The erroneous perception of being an illegal drug user is to be treated like any other perception of a disability, and is only considered to be a qualifying disability if the employer actually perceives the disability to

provide for a private cause of action); *Abate v. S. Pacific Transp. Co.*, 928 F.2d 167 (5th Cir. 1991) (concluding that Federal Railroad Safety Act provides no private cause of action to enforce regulations implementing federally mandated drug-testing programs set forth in 49 C.F.R. Part 40).

This Court similarly concludes that the FOTETA is framed as a general mandate to the Department of Transportation as the regulations promulgated under part 40 are applicable to the Federal Highway Administration, Federal Railroad Administration, Federal Transit Administration and Federal Aviation Administration. *See* 49 C.F.R. § 40.25 (f)(10)(B). This regulatory scheme does not evince a concern for the protection of drivers who believe that they have been aggrieved through the drug testing process. *Cf. Drake*, 147 F.3d at 170-71; *Schmeling*, 97 F.3d at 1343-44. Furthermore, federal regulations in and of themselves cannot create a private cause of action unless the action is at least implied from the applicable statute. *See Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976, 979 (6th Cir. 1993). Therefore, this Court holds that the district court properly concluded that the FOTETA or the regulations promulgated thereunder do not imply a private cause of action and properly granted summary judgment on Plaintiff's claim.

### 2. Plaintiff's Wrongful Termination Claim

### a. Wrongful Termination under the ADA

Plaintiff next argues that the district court erred in granting summary judgment as to his wrongful termination claim under the ADA. The district court concluded that Plaintiff had failed to exhaust his administrative remedies inasmuch as it found that there was no evidence that Plaintiff had filed a charge of discrimination with the EEOC.[2] The district court

---

[2]Although Plaintiff did not obtain a right-to-sue letter prior to commencing this action, he did obtain the right-to-sue letter on April 21, 1998 prior to the summary judgment motion. However, Plaintiff failed to

further concluded that even if Plaintiff had exhausted his administrative remedies, there was no genuine issue of fact and Plaintiff's claim could not survive summary judgment. Although this Court finds that Plaintiff's failure to obtain a right-to-sue letter prior to commencing this action was not a jurisdictional defect, but rather a condition precedent which Plaintiff cured, we nevertheless conclude that the district court properly granted summary judgment as there was no genuine issue of fact and Plaintiff failed to produce evidence on which a reasonable jury could find that he was terminated in violation of the ADA.

Under the ADA, a claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1); *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000). An employee may not file a suit under the ADA if he or she does not possess a right-to-sue letter from the EEOC because he or she has not exhausted his or her remedies. *See* 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117(a) (procedures from § 2000e-5 apply to ADA claims); *see also EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 456 (6th Cir. 1999). However, the failure to obtain a right-to-sue letter is not a jurisdictional defect; rather the right-to-sue letter is a condition precedent. *See Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1032 (6th Cir. 1998). Accordingly, the requirement of obtaining a right-to-sue letter may be waived by the parties or the court. *See id.* at 1031.

In *Portis v. Ohio*, 141 F.3d 632 (6th Cir. 1998), a plaintiff brought suit against the state of Ohio under Title VII and Ohio state law for sexual discrimination. The district court dismissed the plaintiff's claim without prejudice because the plaintiff had not yet exhausted her administrative remedies because she had not obtained a right-to-sue letter from the

---

inform the court of his receipt of the right-to-sue letter until he filed the motion for reconsideration.

EEOC as required by 42 U.S.C. § 2000e-5 and had not filed a charge with the Ohio Civil Rights Commission as required by 42 U.S.C. § 2000e-5(c) and 29 C.F.R. § 1601.73. *See id.* at 633. In *Portis*, the plaintiff received her right-to-sue letter one week after she filed her complaint. On appeal, the State of Ohio argued that plaintiff's failure to exhaust her administrative remedies was a proper alternative ground upon which to dismiss Plaintiff's claim. *See id.* at 634. This Court, however, rejected the State of Ohio's contention, stating that "[w]e see no reason to bar [the plaintiff's] claim solely on the grounds of a non-jurisdictional requirement whose brief absence caused Ohio no prejudice in this case." *Id.* The Court went further to hold that "the proper time for Ohio to raise this argument was between the filing of the lawsuit and [the plaintiff's] receipt of the letter." *Id.* at 635.

Here, although Plaintiff did not apprise the district court of his right-to-sue letter until his motion for reconsideration,[3] Plaintiff had in fact received the right-to-sue letter prior to the district court's order granting summary judgment. However, as in *Portis*, there is no jurisdictional defect and no evidence that Defendants suffered any prejudice from Plaintiff's failure to initially satisfy this condition precedent, a defect he later cured. *See Portis*, 141 F.3d at 634. We therefore think it would be unduly harsh, under these circumstances, to deny Plaintiff his day in court as to his ADA claim; accordingly, we conclude that the district court improperly dismissed Plaintiff's claim on that basis.

Nevertheless, this Court determines that Plaintiff's claim for wrongful termination under the ADA to be without merit. To state a claim under the ADA, Plaintiff must establish a *prima facie* case of discrimination. *See Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000). Once Plaintiff establishes a *prima facie* case, the

---

[3] In his motion for reconsideration, Plaintiff claims that he "relie[d] on his Sur-reply(s) to both Mohawk Motors and Austintown ER wherein Plaintiff provided a copy of the EEOC charge and the Right to Sue letter . . . ." (J.A. at 1258.)