NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0488n.06
Filed: June 10, 2005

Nos. 03-2334, 03-2417

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| D.E. & J. LIMITED PARTNERSHIP, Individually, and on behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| CHARLES CONAWAY, JEFFREY BOYER, MARK S. SCHWARTZ, MATTHEW F. HILZINGER, MARTIN E. WELCH and PRICEWATERHOUSECOOPERS LLP, | ) ) ) ) ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

Before: KENNEDY, DAUGHTREY, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. On January 22, 2002, Kmart Corporation, one of the most familiar brands in discount retailing and one of the largest—operating through approximately 1,900 stores with approximately 234,000 employees—filed for bankruptcy. Kmart's bankruptcy announcement was followed by a predictable drop in its stock price, by the restatement of some of its interim financial reports and by this securities fraud lawsuit.

On February 21, 2002, D.E. & J. Limited Partnership filed this lawsuit on behalf of a class of Kmart stockholders who purchased their stock from March 13, 2001, to May 15, 2002, against

several of Kmart's senior executives and its auditor, PricewaterhouseCoopers (PwC). The district court dismissed D.E. & J.'s complaint with prejudice for failing to meet the pleading standards of the Private Securities Litigation Reform Act (PSLRA). As the plaintiffs have failed adequately to plead "loss causation" under 15 U.S.C. § 78u-4(b)(4) and *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005), we affirm.

I.

Kmart is a Delaware Corporation. Its principal place of business is Troy, Michigan, where it was first incorporated as the successor to the business developed by its founder, S.S. Kresge.

In May of 2000, Kmart hired Charles Conaway and gave him a mandate to revitalize the discount-retail chain. During his tenure as Kmart's Chairman and Chief Executive Officer from May 2000 until his resignation in March of 2002, Conaway replaced much of Kmart's existing management. Two of the individual defendants in this case were among the officers that Conaway hired or promoted during this period: Mark Schwartz, who was Kmart's President and Chief Operating Officer from March 14, 2001, until November 9, 2001; and Jeffrey Boyer, who was Kmart's Chief Financial Officer from May 4, 2001, until November 9, 2001. The other two named individual defendants were among those officers whom Conaway replaced at the very beginning of the class period: Matthew Hilzinger, who was Kmart's Vice President and Controller until July 2001; and Martin Welch, who was Kmart's Executive Vice President and Chief Financial Officer until May of 2001.

In order to compete more effectively with Kmart's two principal rivals, Wal-Mart Stores and Target Corporation, Conaway implemented several projects intended to strengthen Kmart's inventory controls, customer service and price competitiveness. These initiatives achieved initial success, with Kmart reporting improved sales and gross margins and an improving inventory situation. The price of Kmart stock, as a result, rose from $9.19 per share on March 13, 2001, to $13.16 per share on August 7, 2001, an increase of 43% at a time when the stock market was generally stagnant or declining.

Kmart's brief financial success during this period, D.E. & J. alleges, was the result of accounting fraud. According to D.E. & J., senior executives at Kmart represented that Kmart was experiencing a financial turnaround while concealing the extent of Kmart's financial difficulties in several ways. First, Kmart allegedly tried to mask losses by using interim financial statements that reported rebates that it hoped to earn from its vendors at the end of the year. By reporting vendor rebates as a reduction of expenses in interim statements and by basing its interim statements on aggressive forecasts, Kmart ran the risk that it would not ultimately obtain all of the rebates and that its interim statements would reflect unrealistically high projections of future sales. Second, Kmart's outdated internal control system failed to track and monitor inventory effectively, (1) reporting an item as "in-stock" even if the company had only one piece of inventory, (2) causing stores to accumulate obsolete merchandise and (3) ultimately misstating inventory ledgers. Third, Kmart's aggressive efforts to obtain discounts and other benefits from its vendors damaged the company's long-term relationships with its vendors. Fourth, Kmart's expansion of its "Bluelight Special"

discount program to a "Bluelight Always" program failed, because the company's competitors responded by cutting their prices as well.  JA 0140.

By late 2001, whether as a result of fraud or not, it was clear that Conaway's initiatives were not succeeding.  In October of 2001, the company disclosed that its sales had been flat during September, and in November and December the company disclosed a decline in sales.

On January 22, 2002, Kmart filed for bankruptcy.  In a press release, the company attributed its bankruptcy filing to a "combination of factors, including a rapid decline in its liquidity resulting from Kmart's below-plan sales and earnings performance in the fourth quarter." JA 0155.  The price of Kmart's stock subsequently dropped from $1.74 to $0.70 per share.

On January 25, 2002, Kmart disclosed that it had received an anonymous "whistleblower" letter expressing serious concerns about the Company's accounting methods and financial results. The anonymous author of the letter stated that he or she had "kept copies of transactions [he or she] consider[ed] to be inaccurate" and "recorded conversations during which distortions and misstatement[s] of records were discussed."  JA 0128.  The letter directly implicated Schwartz and PwC. *See* JA 0128 (reporting that Schwartz told a "superior to not be surprised if Kmart shares were trading at four or five dollars per share by the end of the year"); *id.* ("Resident auditors from PricewaterhouseCoopers are hesitant to pursue these issues or even question obvious changes in revenue and expense patterns.").  Kmart announced that it would conduct an internal investigation to look into the allegations.  Three similar letters followed.

On February 21, 2002, D.E. & J. brought this securities fraud lawsuit on behalf of purchasers of Kmart securities between May 17, 2001, and January 22, 2002. The lawsuit initially named only Conaway as a defendant.

On May 15, 2002, Kmart, in its Form 10-K disclosure for fiscal year 2001, reported a loss of $2.42 billion for the year. In addition to adjusting for a single vendor transaction in 2001 and moving a $167 million loss contingency from the fourth quarter to the third quarter (matters not at issue here), Kmart announced that, due to the bankruptcy and resulting inability to estimate vendor purchases and associated allowances, it had changed its policy of estimating and recording vendor allowances on an interim basis. It then restated its financial statements to lower its vendor rebates for the first three quarters of fiscal year 2001 (which until then had not been audited) by $311, $211 and $32 million respectively. In the disclosure, Kmart attributed its bankruptcy filing to a "rapid decline in our liquidity resulting from our below-plan sales and earnings performance in the fourth quarter, the evaporation of the surety bond market and erosion of supplier confidence," and stated that "[o]ther factors includ[ing] intense competition in the discount retailing industry, unsuccessful sales and marketing initiatives, the continuing recession, and recent capital market volatility" played a role as well. JA 0205. Following this announcement, Kmart's common stock dropped five cents, from $1.22 to $1.17 per share.

On June 14, 2002, Kmart announced a $1.45 billion loss during the first fiscal quarter of 2002. The company recorded a charge of $758 million to "write-down inventory in 283 stores that

were closed in May and June, and inventory transferred from the remaining stores to the closing stores." JA 0158.

On August 15, 2002, D.E. & J. filed an amended complaint naming Boyer, Schwartz, Hilzinger, Welch and PwC as defendants; attaching the whistleblower letters; and expanding the class period to March 13, 2001, through May 15, 2002, five months longer than the period in the original complaint. On November 1, 2002, D.E. & J. filed its "corrected consolidated amended complaint," declaring that its counsel had conducted interviews with "[f]ormer employees of Kmart, who worked at the Company during the relevant time" and "[f]ormer employees of certain vendors of Kmart," both of whom, the complaint claimed, were "knowledgeable with respect to the matters referred to herein." JA 0125–26. Any remaining information, the complaint continued, was "within the possession and control of defendants and other Kmart insiders, thus preventing plaintiffs from further detailing defendants' misconduct at this time." JA 0126. The complaint reiterated the expanded class period of March 13, 2001, to May 15, 2002.

On September 19, 2003, the district court dismissed all of the claims with prejudice. In doing so, it determined that D.E. & J. had failed to meet the PSLRA's pleading requirements for scienter and misrepresentation for all defendants except Conaway and Schwartz. The court dismissed the complaint in its entirety, however, because D.E. & J. had failed to plead the necessary element of "loss causation" for any of its allegations. Because D.E. & J. had failed to plead primary violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), by any of the defendants, the district court also found that it had failed to plead that they were "controlling

persons" liable under § 20(a) of the Act, 15 U.S.C. § 78t(a). And the district court denied D.E. & J. leave to amend its complaint, first and foremost because, instead of filing a motion for leave to amend, it had merely requested in its brief that "if the Court concludes that any aspect of plaintiffs' claims are inadequately pled . . . [the plaintiffs] be granted leave to replead and cure any deficiencies." D. Ct. Op. at 58.

## II.

D.E. & J. appeals the dismissal of its § 10(b) claims against all parties save for Boyer, Hilzinger and Welch and appeals the dismissal of its § 20(a) claims against all parties. We review the district court's dismissal of the complaint de novo. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001).

## A.

Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment]" of any "deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). Promulgated under this statute by the Securities and Exchange Commission, Rule 10b-5 forbids the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b).

On the basis of this statute and this rule, individuals may bring a private damages action resembling the common-law tort actions for deceit and misrepresentation. *See, e.g.*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 744 (1975); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976). With the passage of the PSLRA, however, Congress has imposed additional statutory requirements on this private action, including the heightened pleading requirements that a plaintiff (1) specify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2).

Under § 78u-4(b)(4) of the PSLRA, private plaintiffs also must prove that a defendant's securities fraud caused their economic loss. In relevant part, the statute says the following:

> Loss causation. In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

Construing this causation provision, *Dura Pharmaceuticals v. Broudo* recently held that a plaintiff could not satisfy it merely by alleging (and later establishing) that the price of the security on the date of the purchase was inflated because of the misrepresentation. 125 S. Ct. at 1631. In *Dura*, the plaintiff represented a class of individuals who bought stock in Dura Pharmaceuticals on the public market between April 15, 1997, and February 24, 1998. *See id.* at 1629. During that period, the plaintiffs alleged, Dura (or its officials) made false statements concerning its profits and the prospects for future approval by the Food and Drug Administration (FDA) of its products. Upon

disclosure of the news on February 24, 1998, that its earnings would be lower than previously expected (principally due to slow drug sales), Dura's shares lost almost half of their value, falling from $39 per share to about $21 per share. *See id.* at 1630. In November of 1998, Dura announced that the FDA would not approve its new product, prompting a further drop in its share price. *See id.* The plaintiffs argued that, "[i]n reliance on the integrity of the market, [they] . . . paid artificially inflated prices for Dura securities and . . . suffered damage[s] thereby." *Id.* (quotations and emphasis omitted).

This type of allegation, the Supreme Court concluded, did not adequately plead loss causation under the PSLRA. Because a purchaser may sell the "shares quickly before the relevant truth begins to leak out," *id.* at 1631, a seller's misrepresentation (and its associated inflated price) does not inevitably lead to a loss, but rather "*might* mean a later loss," *id.* at 1632. Even if the purchaser later resells those shares at a lower price, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* "[A]t the moment the transaction takes place," therefore, "the plaintiff has suffered no loss," *id.* at 1631, and the most than can be said "is that the higher purchase price will *sometimes* play a role in bringing about a future loss," *id.* at 1632.

Drawing on this insight and on the observation that securities-fraud actions resemble common-law fraud actions that have long required a showing that an individual suffered actual economic loss, the Court held that private securities-fraud plaintiffs may recover damages only when

they "adequately allege and prove the traditional elements of causation and loss." *Id.* at 1633. And although the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), the mere allegation that the plaintiff class purchased their shares at an artificially inflated price did not serve to place the defendants on "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 1634 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The *Dura* complaint (1) failed "to claim that Dura's share price fell significantly after the truth became known," (2) failed to specify "the relevant economic loss," and (3) failed to describe "the causal connection . . . between [the] loss and the misrepresentation." *Id.* Without the requirement that a plaintiff "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," the Court concluded, the securities laws would become nothing more than "a partial downside insurance policy." *Id.*

D.E. & J.'s complaint here does not differ in any material respect from Broudo's. Like Broudo, D.E. & J. did not plead that the alleged fraud became known to the market on any particular day, did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss. Rather, the heart of D.E. & J.'s causation theory looks remarkably like Broudo's allegations in his complaint:

> Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they *paid artificially inflated prices* for Kmart publicly traded securities. Plaintiffs and the Class would not have purchased Kmart publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

> As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Kmart publicly traded securities during the class period.

JA 0189–90 (emphasis added). The recitation of D.E. & J.'s belief that the "defendants' wrongful conduct" "direct[ly] and proximate[ly]" caused the plaintiffs' losses does not change matters. For if these allegations would suffice here, the mere inclusion of boilerplate language would suffice everywhere and would defeat the requirement that a plaintiff explain how the loss occurred.

In D.E. & J.'s view, two other facets of this case distinguish it from the pleading failings that doomed the complaint in *Dura*. First, D.E. & J. claims that the complaint's observation that the price of Kmart stock dropped from $1.74 per share to $0.70 per share on January 22, 2002, following the company's disclosure that it had filed for reorganization under Chapter 11, suffices to plead that Kmart caused the investors' losses. *See* JA 0155. And second, D.E. & J. asserts that its observation on appeal that "Kmart's stock did drop more than 4%" on the day that Kmart announced its restatements (May 15, 2002) suffices to meet the statutory requirement. *See* D.E. & J. Br. at 36–37; *id.* at 28 ("[T]he price of Kmart's stock *did decline* after the Company announced its massive restatement.").

Neither of these observations (one in the complaint, the other on appeal) "provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation." *Dura*, 125 S. Ct. at 1634. As to the bankruptcy filing, D.E. & J. never alleged that Kmart's bankruptcy announcement disclosed any prior misrepresentations to the market. *See* JA 0155 (observing only that "[a]ccording to [Kmart's]

press release, the Company's decision to seek 'judicial reorganization' was based on a 'combination of factors, including a rapid decline in its liquidity resulting from Kmart's below-plan sales and earnings performance in the fourth quarter'" and that "[f]ollowing this announcement, the price of Kmart common stock dropped"). And, of course, the filing of a bankruptcy petition by itself does not a security fraud allegation make. *Cf. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (explaining that defendant Merrill Lynch's downgrades in its stock recommendations—from "accumulate" to "neutral" and from "buy" to "accumulate"—did "not amount to a corrective disclosure . . . because they do not reveal to the market the falsity of the prior recommendations"). Here, D.E. & J. has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations caused that drop. But the observation that a stock price dropped on a particular day, whether as a result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.

As to the stock price drop following Kmart's restatements, D.E. & J. never mentioned in its complaint the five cent drop in Kmart's stock prices on May 15, 2002, the day Kmart announced its restatements. By failing even to note that Kmart's stock dropped in price after the company restated its financial records and by failing to present this argument to the district court, D.E. & J. simply never pleaded that the defendants' alleged misrepresentations caused economic losses on May 15, 2002. Ultimately, as in *Dura*, D.E. & J. has said "the following (and nothing significantly more than the following) about economic losses attributable to the . . . misstatement," 125 S. Ct. at 1630:

"Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kmart publicly traded securities." JA 0189. And ultimately, as in *Dura*, that pleading does not satisfy the PSLRA's loss causation requirement.

B.

D.E. & J. also seeks to hold each of the individual defendants liable as "controlling persons" of Kmart under § 20(a) of the Exchange Act. That provision extends liability to

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a); *see also* 17 C.F.R. § 240.12b-2 (defining "control" as "the power to direct or cause the direction of the management and policies of a [company], whether through the ownership of voting securities, by contract, or otherwise").

Because "controlling person" liability is derivative, however, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act. D.E. & J. has not charged Kmart with a violation of the Securities Act, and accordingly it may not bring a claim for recovery under this theory. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696–98 (6th Cir. 2004); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 554 n.11 (6th Cir. 1999); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). The district court properly rejected this claim on the pleadings.

III.

Lastly, we do not believe that the district court abused its discretion in denying D.E. & J. an opportunity to file what would have amounted to a fourth complaint. *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 671 (6th Cir. 2003); *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 306 (6th Cir. 2000). D.E. & J. did not file a formal motion for leave to amend in this case and did not submit a proposed amended complaint to the district court, in contravention of local rules. *See* E.D. Mich. Local R. 15.1 ("A party who moves to amend a pleading shall attach the proposed amended pleading to the motion."). The sole way in which D.E. & J. indicated that it wished to amend its complaint was by "request[ing], almost as an aside in their brief opposing Defendants' motions to dismiss, that 'if the Court concludes that any aspect of the plaintiffs' claims are inadequately pled . . . that they be granted leave to replead and cure any deficiencies identified by the Court.'" D. Ct. Op. at 58. *See* JA 0847 (requesting "an opportunity to amend" the complaint "if the Court deems the claims [ ] insufficiently pleaded"). The district court did not abuse its discretion in choosing not to credit this statement in a brief as a motion to amend where D.E. & J. previously had been given two opportunities to amend its complaint. *See PR Diamonds*, 364 F.3d at 698–700 (upholding the district court's denial of leave to amend where the plaintiffs made the following request in a brief opposing the defendants' motions to dismiss: "Alternatively, in the event the Court grants any part of the Defendants' motions to dismiss, plaintiffs respectfully request leave to amend their Complaint"); *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) (affirming denial of leave to amend because "[w]hat plaintiffs may have stated, almost as an

aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is

[ ] not a motion to amend"); *see also id.* (plaintiffs cannot expect "an advisory opinion from the

Court informing them of the deficiencies of the complaint and then an opportunity to cure those

deficiencies") (emphasis omitted); *Parry*, 236 F.3d at 306 ("[A] party requesting leave to amend

must 'act with due diligence if it wants to take advantage of the Rule's liberality.'") (quotations and

citation omitted).

IV.

For these reasons, we affirm.