Justin JAMISON, Plaintiff,

v.

**DOW CHEMICAL COMPANY,
Defendant.**

No. 03–10226–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Dec. 20, 2004.

Corrected Jan. 13 2005.

Victor J. Mastromarco, Jr., Manda L. Westervelt, Mastromarco & Jahn, Saginaw, MI, for Plaintiff.

Richard B. Lapp, Chicago, IL, Timothy H. Howlett, Dickinson Wright, Detroit, MI, for Defendant.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

The plaintiff, Justin Jamison, was employed by defendant Dow Chemical Company in various capacities at its Midland, Michigan chemical plant from 1987 until he was discharged in May 2003. In February 2001, the plaintiff was diagnosed with an eye disease that rendered him hypersensitive to dust and chemical vapors, occasioning the imposition of work restrictions that limited his ability to work in many of the environments at the defendant's facility. The defendant placed Jamison in five different positions in an effort to accommodate his disability, but terminated his employment after it concluded that it could find no open position for him that fit his medical restrictions. The plaintiff com-

menced this action alleging that his termination violated the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Michigan Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101 *et seq.* Jamison, who is African–American, later amended his complaint to allege in addition that Dow's failure to find a suitable job for him constituted illegal discrimination on account of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) *et seq.* and Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* The defendant has filed a motion for summary judgment, to which the plaintiff has responded. The Court heard the arguments of the parties through their respective counsel in open court on November 22, 2004 and the matter is now ready for decision. The Court finds that the plaintiff has not presented sufficient evidence to warrant a trial on the question of whether his termination was a result of illegal discrimination under federal or state law. The Court, therefore, will grant the defendant's motion for summary judgment.

## I.

Justin Jamison began work for Dow on January 5, 1987 in Midland, Michigan. As part of his employment, the plaintiff was represented by the United Steelworkers of America and his employment was governed by a collective bargaining agreement. Between 1987 and 2000, the plaintiff worked in various locations at the Midland complex including the mail room and different production plants. In 2000, the plaintiff became an engineer technician (ET) and worked in the "827 Building" where Dow produced its Citrucel product. The plaintiff was responsible for loading raw materials, mixing ingredients, processing materials, and packaging Citrucel. This work apparently was dusty, and the plaintiff wore safety glasses and goggles. William Moneypenny was the plaintiff's supervisor.

In February of 2001, the plaintiff was diagnosed with keratoconus and recurrent corneal erosions. According to the plaintiff's treating physician, Miriam Schteingart, M.D., this eye condition exists when the "normally round shape of the cornea is distorted and a cone-like bulge develops resulting in severe vision impairment, and the cornea is also susceptible to scratches and scars[,] which further impair vision." Pl.'s Resp. Br. Ex. 3, Schteingart Aff. at ¶ 4. As a result, the plaintiff is sensitive to chemicals, fumes, vapors, and dirt. He is also sensitive to bright lights, wind, sunlight, and is impaired when driving at night. According to Dr. Schteingart, the plaintiff should be restricted to working in areas "where he will not be exposed to any vapors, fumes, or strong odors in his environment." *Id.* at ¶ 6. The presence of irritating chemicals in the air can also cause him further corneal damage.

Dr. Schteingart also stated that the plaintiff is particularly sensitive to chemicals and heavy dust. The plaintiff's sensitivity is heightened further because his condition forces him to wear contact lenses, including two in the left eye, and the lenses absorb fumes, vapors, strong odors, dust, and chemicals. In fact, the lenses alone can "cause corneal erosion, oxygen deprivation, and blindness." *Id.* at ¶ 16. She states that protective goggles would help shield the plaintiff's eyes from dust and chemical splashes, but they would not protect his eyes from chemical vapors. Accordingly, Dr. Schteingart determined that the plaintiff should work in an environment with only mild dust exposure, such as a laboratory where a hood is present to remove most of the odors, fumes, and vapors from the air.

In his disability report to the Social Security Administration, the plaintiff ap-

pended a document entitled "Living with Keratoconus" in which he explained this condition in his own words. He stated that his vision is severely impaired; his treatment requires him to wear two contact lenses in one eye and one in the other; he is sensitive to bright light, wind, dust, strong odors, and fumes; the contact lenses often dry out and are painful; he cannot read street signs at night; he experiences pain from opening his eyes after sleeping because it tears his corneal scars; the doctor has had to remove scar tissue at times with a scalpel; he cannot read small print without squinting; and short of medical miracle he will have the disease for his whole life and may eventually need a corneal transplant.

Dr. Schteingart stated in her affidavit that the plaintiff's condition "substantially limits" and "constantly effects [sic]" the plaintiff's "ability to see." Pl.'s Resp. Br. Ex. 3, Schteingart Aff. at ¶ 4. The contact lenses improve his vision, but he cannot wear them in the dust- and vapor-laden atmosphere of the chemical plant because the lenses can exacerbate corneal erosion. However, the plaintiff stated both in his deposition and disability report that despite his condition he can perform many basic tasks. He confirmed that he can drive, run his own errands, go shopping, care for himself unassisted, complete household chores, play basketball, football, and baseball, and read books, magazines, and newspapers. Def.'s Mot. Summ. J., Jamison Dep. at 50–52. The plaintiff also can ride a bicycle, prepare all types of meals, pay bills, watch movies with friends, and in engage in other social activities. Def.'s Mot. Summ. J. Ex. 3, Jamison Sworn Statement at 2–4. With the use of his glasses or contact lenses, the plaintiff can perform "detailed work." *Id.* at 4.

The plaintiff was placed on sick leave beginning February 25, 2001. He underwent surgery on his eye in March 2001 and eventually returned to work on August 2, 2001. On October 11, 2001, Dow's health department notified the plaintiff's supervisor that the plaintiff could not be exposed to dust or chemicals in the air but he could wear protective eye equipment. Moneypenny, apparently aware of these restrictions, placed the plaintiff in a number of positions in the 827 Building and finally assigned him to update the Operating Discipline Management System procedures. The plaintiff believed that this position fit well with his medical conditions; however, he said that Moneypenny harassed him: "Bill Moneypenny was telling me that I wouldn't have a job because of my restrictions." Def.'s Mot. Summ. J. Ex. 2, Jamison Dep. at 167. The plaintiff complained to the company by e-mail on October 18, 2001.

The plaintiff was the only African–American employee in the department, and he had complained previously about Moneypenny's treatment of him. Before the plaintiff was diagnosed with keratoconus, he complained to James McDaniel and Rolland Wallace (both African–Americans) in Dow's Work Force Issues Department that he felt that Moneypenny was singling him out by admonishing him in front of coworkers and disciplining him for violating the company's e-mail policy. They investigated the plaintiff's complaints and determined that there was no substantiation for the allegations.

According to Dr. Marcia Lee in Dow's medical department, on November 8, 2001, Dr. Schteingart sent a note indicating that the plaintiff was suffering cornealirritation from exposure to chemicals in the 827 Building and the plaintiff should avoid further exposure. The plaintiff asserts that he was tolerating the environment in his office position, but Dr. Lee took Dr. Schteingart's note to mean that Jamison could not work anywhere in the 827 Build-

ing. Moneypenny then contacted Cal Morgan, who was in charge of the Employee Development Training Resource Pool (EDTRP), told him of the plaintiff's restrictions, and suggested that the plaintiff should be released into the EDTRP for placement outside the 827 Building. Moneypenny asserts that there were no ET positions in that or any other building that satisfied the plaintiff's restrictions.

The plaintiff was placed into EDTRP in December 2001. This move also was approved by the union's joint committee. However, the plaintiff maintains that the transfer was instigated by Moneypenny in retaliation for past complaints of racial discrimination and that the placement departed from Dow's usual practice with respect to the EDTRP. Consequently, the Court will take some time to review the testimony as to Dow's customary procedures by which employees are released into the Pool.

Morgan stated that the primary function of the EDTRP is to place "folks that had either lost their job through a work force reduction or failed off the job." Def.'s Mot. Summ. J. Ex. 16, Morgan Dep. at 5. Generally, Morgan would receive a call from Kevin Ellis in the company's labor-relations unit who would advise him that an employee had been released into the Pool. Sometimes these employees went on to permanent placements, but that choice generally was made by the employee and supervisor of the position. Occasionally, the EDTRP handled the placement of medically restricted employees. Morgan stated that the placement process usually began with a call from a company manager that was in need of assistance. Some managers "have asked for certain, you know, they need packagers, they need somebody to do clean-up or they need somebody to drive a Jeep or that kind of thing." *Id.* at 8. Morgan then would be responsible for contacting the manager to schedule shifts and start times.

During his time at Dow, Morgan dealt with medically restricted employees in addition to the plaintiff. The company's medical team would send Morgan the employee's restrictions, either directly from a physician or as part of a company-generated form. After receiving the restrictions, Morgan "would look at the restrictions, typically I'll send it out to the [production leaders on site]." *Id.* at 10. After he sent out the restrictions to the production leaders on site, he would wait for a response to see if any leaders had appropriate open positions. If he received no responses, Morgan would call around "and ask if anybody has an opening that they can employ this employee with this particular restriction." *Ibid.* Morgan also stated that he was not permitted to place a medically restricted employee in a position that did not fit those restrictions. Morgan also admitted that "we have a responsibility to make sure that an employee doesn't get in a position that is going to either make their restriction worse or put them in danger." *Id.* at 17.

According to Morgan, although he was not permitted to place a medically restricted employee in a job that fell outside the restriction, he was, as part of the collective bargaining agreement, permitted some discretion in choosing positions. Morgan agreed that as part of the collective bargaining agreement between Dow Chemical and the United Steelworkers dated February 19, 2001, there were five options for dealing with medically restricted employees in the temporary pool: freezing the employee in the current job assignment; placing in an open job in the same department; placing in an open job in another department; granting department bumping rights; and freezing in the job assignment after new placement. Morgan also

stated that he used a medical restrictions flow chart to assist in placing medically restricted employees, but ultimately, the decision to place a restricted employee was the company's and not the union's.

Morgan also related his own experience placing restricted employees. Once during the time he had been with the Pool, Morgan recalled placing James Malton, a white restricted employee who belonged to the union, in a special assignment. He stated that he had placed several other white medically restricted employees in temporary positions: Rocky Chase, Chris Walchak, Shelley Knight, and Tim Miles. Another employee, Darrel Dacko, had been in the pool for a year and was then on leave with a job waiting for him upon his return.

Although Morgan could not recite the plaintiff's restrictions with certainty, he recalled that the plaintiff could not be "around dust, fumes, vapor . . . . I know he can't be around any of that." *Id.* at 9. In the plaintiff's case, Morgan stated that he had been involved in a medical review board procedure. The purpose of the review board was "to discuss an employee's restrictions, whether or not they may not have asked to get on LTD (long-term disability). How long the restrictions, how long we think the restrictions are going to last, what jobs we think they're going to be able to do, that kind of thing." *Ibid.* Typically, a medical review board consists of someone from the company's legal department, a neutral manager, a supervisor, and a representative from the medical department.

In December, 2001, Morgan placed the plaintiff in the 489 Building as a warehouse packager. The plaintiff stated in his deposition that this building was the called the "herbicide" building and was known around the Dow facility for the strong chemical odors and vapors inside. The plaintiff also stated that he discussed the position with the a union steward and met with Dr. Lee. According to Dow, Dr. Lee personally had checked the facility and was not aware of any strong odors; she believed the position met the plaintiff's medical restrictions. Later that month, the plaintiff attended an orientation in the 489 Building but afterward reported that he could not work there because of an odor. After one day in the building, the plaintiff's eyes became irritated and painful. On December 20, 2001, Dr. Schteingart reiterated that the plaintiff should not be exposed to strong odors in his environment.

In January 2002, the plaintiff took a position that Morgan had found for him on the anthrax inspection team involving inspecting packages and incoming mail in the 9004 Warehouse. Before taking the position, Jamison again talked to the union steward. The plaintiff worked in that position for approximately two months and wore a dust mask, goggles and safety glasses while he worked. The assignment was temporary, and Dow dissolved the team and attempted to reassign the employees in this position. When this position was dissolved, Tom Schnurr, the supervisor of the team, asked if the plaintiff and others would stay on to help. Although the plaintiff did not know the exact nature of the job, he felt it might meet his medical restrictions. He told Schnurr, however, that he could not stay on because Morgan directed his placements.

On April 8, 2002, Dow updated the plaintiff's medical restrictions as result of a letter from Dr. Schteingart stating that Jamison's restrictions included no exposure to any fumes, vapors, strong odors, and heavy dust that could irritate the plaintiff's eyes; and the plaintiff should be placed in a warehouse with mild dust exposure or in a lab with a hood to absorb chemicals. That day, the plaintiff was assigned to the 433 Warehouse—the Styrene

plant—where he oversaw the transfer of pellets from a chute into bulk boxes. The production leader stated in his declaration that no chemicals were processed or packed in that warehouse. The plaintiff worked there for approximately a month and a half during which time he wore safety glasses or goggles. After some time there, the plaintiff found the dusty environment aggravated his eyes. The plaintiff did, however, feel he could work in that building in a general maintenance position moving furniture, changing light bulbs, and stocking the warehouse. According to Dow, the plaintiff stopped working in the warehouse because the job was "drafty" and "dusty."

Mikal Shanks, a union representative and member of the joint committee, recommended that the plaintiff be placed in the general maintenance position. Shanks stated that although he did not remember specific times in which he made recommendations to Morgan, he did recall recommending a position as a "good fit" for the plaintiff's medical restrictions in the mail room of Building 433 and that Dow had disagreed with him. While the plaintiff was in the pool, Morgan stated that he had spoken back and forth with Shanks about the plaintiff's medical restrictions. "We worked together to try to find Justin a job that he could fit; that felt fit his medical restrictions." Def.'s Mot. Summ. J. Ex. 16, Morgan Dep. at 14.

Morgan also testified that at times Shanks would recommend a position, but that Morgan determined these recommendations not to be an option. Once, Shanks asked if the plaintiff could be placed as a safety auditor, but Morgan replied "absolutely not." *Id.* at 21. Morgan stated that a safety auditor position would not fit with the plaintiff's medical restrictions because it entailed working with chemicals in dusty environments wearing goggles, a hard hat, and "all kinds of stuff." *Id.* at 32. Appar-

ently, the plaintiff had notified Dow previously of his inability to wear goggles. Morgan also recalled that on some occasions, the plaintiff had called Morgan to discuss other positions. According to Morgan, he placed the plaintiff in a job in Building 433 at the plaintiff's request, but on other occasions had declined the plaintiff's requests. Morgan stated that he typically looked to the managers and discussed with them the potential health hazards of a temporary position, and he followed that practice in the plaintiff's case.

On May 20, 2002, the plaintiff began work in the 2040 Building and initially was trained in the mail room. The plaintiff handled incoming and outgoing mail and recorded incoming mail into a computer. The plaintiff also spent some time in trucking services when he replaced an injured employee. According to the plaintiff's supervisor, Tom Schnurr, no chemicals had ever been processed in the building and there was an HVAC system to minimize dust and other air particulates. The plaintiff apparently worked in this building for some weeks and then went on sick leave. The plaintiff stated that although he was able to tolerate the furniture moving that was part of his job in trucking services, he was not able to tolerate the dust in the mail room.

On June 26, 2002, the plaintiff returned to work from sick leave and requested placement in the trucking services section of Building 2040. After being informed that no open positions were available, the plaintiff again went on sick leave until August 12, 2002.

On August 12, 2002, the plaintiff began work in his final position with Dow; it was in the 1803 Building housing the toxicology department. Before beginning this position, the plaintiff spoke with the union steward and the supervisor. His duties included cleaning the rooms and cages of

animals housed in the building. According to the plaintiff, the job required him to clean these cages with an acid solution; he was also exposed to animal dander. While working there, the plaintiff wore rubber gloves, a rubber suit, goggles, a face shield, and glasses. Some time after starting work, the plaintiff complained that the vapors were affecting his eyes, and his supervisor suggested he be fitted for a full-mask respirator, but he was unable to schedule a certification procedure. The plaintiff noted that he was able to tolerate the job in the beginning because he made arrangements with others in the building to complete basic maintenance work instead of cleaning cages. On September 5, 2002, the plaintiff informed Dow he could no longer work in the toxicology department and was returned to the temporary pool.

On May 12, 2003, Dow terminated the plaintiff's employment after placing him on medical leave under the Family and Medical Leave Act. Morgan authored the plaintiff's termination letter. However, he did not make the decision to terminate the plaintiff; instead "we have ERBs, Employee Review Boards[,]" that make the decision. Def.'s Mot. Summ. J. Ex. 16, Morgan Dep. at 12. Morgan served on the board because he was the plaintiff's current supervisor. In the termination letter, Morgan wrote:

> The Company has used all reasonable efforts in an attempt to find an open job you could perform in light of your medical restrictions. However our efforts were unsuccessful due to your refusal to accept our five different offers of accommodation.

*Id.* at 13. Morgan also testified that he knew this letter would become part of the plaintiff's permanent record and wanted the record to reflect the five offers of accommodation. Dow paid the plaintiff's medical benefits through May of 2003.

Thereafter, the plaintiff filed a grievance with the union alleging that Dow failed to make reasonable accommodations as outlined in the collective bargaining agreement. Dow denied the grievance and the union subsequently accepted the company's denial. The plaintiff currently receives long-term disability and unemployment benefits. In February 2003, the plaintiff applied for Social Security disability benefits. He has not worked since September 4, 2003.

On September 18, 2003, the plaintiff filed the present action, and, as noted above, he amended his complaint on April 9, 2004, so that he now states claims under the ADA, the PWDCRA, Title VII, and the ELCRA. The defendant moved for summary judgement on all counts.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*,

260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

▮ The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material

showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

▮ The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

### A.

▮ The Court turns first to the plaintiff's claims of disability discrimination under the ADA and the PWDCRA. The plaintiff's claims under the Americans with Disabilities Act and Michigan's state law equivalent, the Persons with Disabilities Civil Rights Act, can be addressed in tandem because the claim under Michigan law mirrors the federal claim. *See Monette v. Electronic Data Sys.*, 90 F.3d 1173, 1177 n. 3, 1186 (6th Cir.1996) (holding that because claims of disability discrimination under Michigan law essentially track those under federal law, resolution of Monette's claim under the ADA also dispensed with his claims under the PWDCRA).

Congress enacted the Americans with Disabilities Act in an effort to "eliminate[ ] discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act prohibits qualifying employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to . . . hiring, advancement or discharge, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). If

an employee suffers discrimination because he or she has a disability as defined by the ADA, has a record of having such a disability, or is regarded by his or her employer as having such a disability, 42 U.S.C. § 12102(2), the employee may bring an action seeking various remedies, including damages, provided that the employee first files a timely complaint with the EEOC. 42 U.S.C. §§ 12117, 2000e–5(f)(1). *See Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299 (6th Cir.2000).

■ When an employer moves for summary judgment on an ADA claim, an employee must come forward with evidence that demonstrates genuine material fact issues on each of the following elements: (1) the plaintiff is an individual with a disability; (2) he is "otherwise qualified" to perform the job requirements, with or without reasonable accommodations; and (3) his employer performed an adverse employment action against him because of his disability. *Williams v. London Utility Com'n*, 375 F.3d 424, 428 (6th Cir.2004) (citing *Cotter v. Ajilon Servs.*, 287 F.3d 593, 598 (6th Cir.2002)).

The defendant argues that the plaintiff cannot establish a *prima facie* case under the ADA because he is neither "disabled" within the meaning of the ADA nor otherwise qualified for the position with or without reasonable accommodation.

1.

The ADA defines a "disability" as a physical impairment that "substantially limits one or more ... major life activities." 42 U.S.C. § 12102(2)(A) (1994 ed.). The Supreme Court has held that the qualifiers in the Act's definition of "disability" must by narrowly construed. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (stating that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled" since Congress estimated

that 43 million individuals suffered from disabilities, and therefore "[i]f Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher"). The Court declared, therefore, that "'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree,'" and "'[m]ajor' in the phrase 'major life activities' means important." *Id.* at 196–97, 122 S.Ct. 681.

■ There can be little question that seeing constitutes an important, major life activity. *See* 29 C.F.R. § 1630.2(i) (defining major life activities as "functions such as caring for oneself, performing manual tasks, walking, *seeing,* hearing, speaking, breathing, learning, and working") (emphasis added). Likewise, the defendant does not seriously dispute the proposition that the plaintiff's eye disease, which affects his vision, is a "physical impairment." *See* 29 C.F.R. § 1630.2(h)(1) (2001) (stating that a "physical impairment" is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting [certain] body systems"). The assessment of whether such an impairment constitutes a "substantial limitation" is more complicated: it "ultimately requires an individualized, fact-specific inquiry into the effect of an impairment on a plaintiff's life." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 582 (6th Cir.2001) (citing *Sutton v. United Air Lines*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

■ Federal regulations refer to a hypothetical "average person in the general population" as a benchmark for evaluating substantial limitations on life activities. *See* 29 C.F.R. § 1630.2(j)(1) (stating that a person is substantially limited if she is "[u]nable to perform a major life activity

that the average person in the general population can perform, or [is s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"). Factors to consider in making this assessment include "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2). Short-term, temporary limitations on major life activities do not constitute disabilities under the ADA. *See Roush v. Weastec, Inc.,* 96 F.3d 840, 844 (6th Cir.1996).

▆▆▆ In determining whether a condition subject to treatment is substantially limiting, the Court must take account of the treatment prescribed and administered. Thus, "[t]he use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantial limiting." *Sutton,* 527 U.S. at 488, 119 S.Ct. 2139 (emphasis in original). If, for instance, an otherwise substantially limiting impairment is brought under control with medication, the individual is not disabled. *Hein v. All America Plywood Co., Inc.,* 232 F.3d 482, 487 (6th Cir.2000) (holding that a plaintiff who "functions normally and has no problems 'whatsoever'" with aid of blood-pressure medication not disabled). On the other hand, if the medication itself produces disabling side-effects, a finding of disability is appropriate. *Sutton,* 527 U.S. at 484, 119 S.Ct. 2139.

▆▆▆ The concept of disability under the ADA, then, relates to functional limitations. Although these functional limitations must, of course, be caused by a physical or mental impairment, the court must assess what the plaintiff can and cannot do compared to the "average person," not what he does or does not suffer from. The major hurdle that the plaintiff faces in this case is that he admits an ability to perform most tasks that require sight. He testified as follows at his deposition:

Q: Are you able to read using those prescription eye glasses?

A: It is pretty tough to do.

Q: But you're able to do it.

A: I can do it depending on the condition of my eyes once again.

Q: Are you able to read standard newspaper print ...?

A: Depending on the condition of my eye.

Q: Are you able to do your house work?

A: Yes.

Q: Do you ever drive with the prescription eye glasses on?

A: Yes.

. . .

Q: Do you run your own errands?

A: Yes.

Q: Do you do your own shopping?

A: Yes.

Q: Do you care for yourself?

A: Yes.

Q: Do you do all the chores around the house?

A: Yes.

. . .

Q: What sports [are your hobbies]?

A: Basketball, football, baseball.

Q: What do you do with regard to those sports?

A: Watching them, playing them.

Q: And what do you do regarding the reading?

A: Just enjoy reading.

Q: What types of things?

A: Anything.

Q: So books, magazines?

A: Yes.

Q: Newspapers?

A: Yes.

. . .

Q: Are you able to balance your checkbook?

A: Yes.

Def.'s Mot. Summ. J. Ex. 2, Jamison Dep. at 50–52.

The plaintiff also completed a sworn statement to the Social Security Administration in support of an application for benefits in which he acknowledged an ability to perform tasks requiring sight, although he asserted that on occasion he needed correction for his vision:

14. **PERSONAL CARE**

a. Explain how your illnesses, injuries, or conditions affect your ability to:

Dress N/A
Bathe N/A
Care for hair N/A
Shave Must wear contacts or I may end up cutting myself from poor vision.
Feed yourself N/A
Use the toilet N/A

b. Do you need any special help or reminders to take care of your personal needs and grooming?

____ Yes X No

. . .

16. **MEALS**
a. If you fix or prepare your own meals what kind do you prepare?
Any type, I can eat anything

How often do you prepare food or meals?
*(For example, daily, weekly, monthly)*
Daily

How long does it take you?
task specific, nothing out of the ordinary.

17. **HOUSE AND YARD WORK**

a. List the household chores, both indoors and outdoors, that you are able to do

I can do any/all household chores.

18. **GETTING AROUND**

a. How often do you go outside? Daily

b. When out go out, how do you travel?
(Check all that apply)
 X Walk

 X Drive a car

 X Ride in a car

 X Ride a bicycle

. . .

d. Do you have a driver's license? X Yes

Def. Mot. Summ. J. Ex. 3, Jamison Sworn Statement at 2–4. In addition, the plaintiff also marked "yes" to the question asking if he could: pay bills, count change, handle a savings account, and use a checkbook/money orders. *Id.* at 5. For question 21 asking about his hobbies and interests, he stated that he reads, watches television, plays sports, and cooks. *Id.* The plaintiff wrote that he engages in socializing, goes to dinner, watches movies, and goes shopping with others on a regular basis. *Id.* The plaintiff further noted that he "must focus to avoid mishaps," that his "vision is compromised," and that he "must focus to avoid missing steps. . . ." *Id.* at 6. Finally, the plaintiff stated that he used glasses and contact lenses "for adequate vision" and to "do detailed work." *Ibid.*

The undisputed evidence in the record demonstrates, therefore, that although the plaintiff has pain and limited vision because of keratoconus, that condition does not limit his ability to perform activities involving sight "considerably" or "to a large degree." By his own words, the plaintiff is not *prevented* from doing anything requiring sight. Further, he drives a car, reads, prepares meals, plays sports, balances his checkbook, watches television, and rides a bicycle.

The Court has found no case in which keratoconus was determined to constitute a "substantial impairment" under the

ADA, although in one reported decision a court found that the condition did not substantially limit a major life activity. *See Person v. Wal–Mart Stores, Inc.,* 65 F.Supp.2d 361, 364 (E.D.N.C.1999). In that case, the plaintiff was employed as a full-time teacher's assistant working from 7:30 a.m. until 3:30 p.m., Monday through Friday. To supplement her income, the plaintiff sought employment with and was hired by Wal–Mart as a part time sales clerk. The plaintiff advised Wal–Mart that she had keratoconus and was unable to work past 10:00 p.m. because her condition caused eye pain, blurring, and dizziness after that time. Wal–Mart initially accommodated her impairment and allowed the plaintiff her desired schedule, but ultimately discharged her because she was able to work past 10:00 p.m. The court rejected the plaintiff's ADA claim, reasoning that the condition was not a substantial limitation on her ability to see. The court noted that "a visual impairment which hinders, or makes it more difficult for an individual to function at a full visual capacity, does not amount to a substantial limitation on one's ability to see where the evidence suggests the individual can otherwise conduct activities requiring visual acuity." *Id.* at 364 (quoting *Cline v. Fort Howard Corp.,* 963 F.Supp. 1075, 1080 (E.D.Okla.1997)).

The *Person* court's reasoning is reinforced by the Supreme Court's teaching in *Toyota Motor* that the terms in the definition of disability in the ADA must be "interpreted strictly." 534 U.S. at 197, 122 S.Ct. 681. In this case, the Court cannot find from the evidence presented that the plaintiff's ability to see is significantly less from a functional standpoint than that of the average person. The Court concludes, therefore, that the plaintiff has not established the first element of his *prima facie* case under the ADA, and by analogy, under the PWDCRA.

**2.**

The defendant also contends that the plaintiff has not offered evidence that he is a qualified person with a disability since he cannot show that he can perform his job with or without a reasonable accommodation. The plaintiff admitted, in essence, that he cannot perform his job without an accommodation. He testified:

Q: And you choosing to go on long-term disability. In order to get long-term disability, you need to follow this process which includes disagreeing with the Notice of Disapproved claim and filing an appeal and request for hearing with an administrative law judge.

A: You're using different semantics, I am doing this because I was fired. I want to work, I can work. Dow Chemical fired me and I have to go through this process to continue my livelihood that's what I have to do.

Q: Why not get another job?

A: Excuse me?

Q: Why not get another job?

A: Because I can work in the one that I had if I had a reasonable accommodation according to my doctors orders.

Def.'s Mot. Summ. J. Ex. 2, Jamison Dep. at 184. The question, therefore, is whether a reasonable accommodation would permit the plaintiff to continue his employment with Dow.

Dow does not contend that an accommodation proposed by the plaintiff would impose an undue burden. Rather, Dow insists that it tried five times to find a position that fit within the plaintiff's medical restrictions and was unsuccessful because the plaintiff could not accept the positions. Dow argues, therefore, that it discharged its duty under the ADA as a matter of law.

The distinction between the employer's burden of showing undue hardship and the

employee's burden of demonstrating an ability to perform essential job functions was described by the Sixth Circuit in *Monette:*

> [T]he disabled individual bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable. The Seventh Circuit has described the employee's initial burden on this issue as showing "that the accommodation is reasonable in the sense both of efficacious and of proportional to costs." *Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir.1995). Additionally, nothing in the statute alters the burden the disabled individual bears of establishing that he or she is capable of performing the essential functions of the job with the proposed accommodation. Put simply, if the employer claims that a proposed accommodation will impose an undue hardship, the employer must prove that fact. If the employer claims instead that the disabled individual would be unqualified to perform the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation.

*Monette*, 90 F.3d at 1183–84.

██ The plaintiff contends that he has offered evidence of other positions at Dow that he was capable of performing, but a close examination of the record suggests that the plaintiff's proofs are insufficient to withstand summary judgment. First, the plaintiff points to his work with the Anthrax inspection team, where he asserts he had no difficulty with his eyes. The plaintiff claims that there was a vacant position with the team which was offered to him by supervisor Tom Schnurr. However, the portions of his deposition that he cites in support of that claim state that the plaintiff worked as part of an anthrax campaign, the campaign ended, and although Schnurr needed additional workers, the plaintiff did not know what type of position it was:

Q: Why did you stop working that job?

A: I was—The campaign ended.

· · ·

Q: Do you know what happened to the persons working on the anthrax -

A: I know one of the last days on that particular campaign the manager of COBA Tom Schnurr approached us and said I'm having a problem with staffing in my COBA department. I need bodies, can any of you guys stay here.

And my reply was I can't, you know, I would love to stay because I want to work. But my movement is determined by Cal Morgan and you will have to take it up with him . . .

· · ·

Q: Do you know what he was referring to in terms of the position within the COBA?

A: No, I don't. That is a mail room type of capacity something to do with COBA.

Def.'s Mot. Summ. J. Ex. 2, Jamison Dep. at 82, 123–24. The plaintiff also refers to a letter he wrote to Dow's general manager in which he stated that he received correspondence from Cal Morgan advising him that he was no longer needed in COBA. However, this evidence fails to demonstrate that the plaintiff even brought a new position to the attention of the defendant or why it was objectively unreasonable for the defendant not to place him there. Under Sixth Circuit precedent, it is *the employee* who bears the burden of initially proposing an accommodation that is reasonable. *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir.2004) (stating that "[a]

disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable' ") (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633–34 (6th Cir.1998)). In fact, the plaintiff actually told Schnurr that he could not work there. The plaintiff does not demonstrate that he contacted Cal Morgan with this information or whether Cal Morgan in fact refused this request on objectively unreasonable grounds. The plaintiff further admits that he did not know the exact particulars of the offered position and thus he himself did not know if he could perform the work or was even qualified to attempt it.

 The plaintiff also claims that he could have performed work on the plastic packaging line that involved general maintenance away from the dust and dirt, continued work as a furniture mover with COBA, and performed various other general maintenance work throughout the building; he asserts further that his union representative Mikal Shanks recommended these positions. Shanks stated that although he did not remember specific times that he made recommendations to Morgan, he did recall recommending a position in the mail room of Building 433 as a "good fit" for the plaintiff's medical restrictions and that Dow had disagreed with him. However, the plaintiff has presented no specific evidence that he could have performed this job and, in light of the temporary nature of the job pool, why this accommodation was objectively reasonable. Under the ADA, an employer is required only to transfer an employee to a comparable position in terms of pay and status. *See Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 728 n. 3 (6th Cir.2000).

The plaintiff also contends that he requested a transfer to an ET position in the 1776 Building that fit his medical restrictions. According to the plaintiff, Shanks told him of the vacancy and to inquire about it, which the plaintiff did. The plaintiff acknowledged that workers "handled chemicals there, but that it was a pretty clean building typically." Def's Mot. Summ. J. Ex. 2, Jamison Dep. at 103. The plaintiff apparently was told that he probably could not work there because of his medical condition. The only evidence to the contrary is the plaintiff's rendition of "an unwritten rule" that this building was cleaner than most. *Id.* at 198. This testimony does not create a genuine fact issue as to whether the plaintiff was qualified to work in Building 1776, especially in light of evidence that the plaintiff had been in buildings where no chemicals had been processed and experienced difficulties.

Finally, the plaintiff claims that he could have worked in a special assignment as a safety auditor, that Shanks recommended this position to Morgan, and that Morgan refused. Morgan acknowledged that Shanks asked if the plaintiff could be placed as a safety auditor, but Morgan replied, "absolutely not." Def.'s Mot. Summ. J. Ex. 16, Morgan Dep. at 21. Morgan stated that a safety auditor position would not fit with the plaintiff's medical restrictions because it entailed working in dusty environments with chemicals along with wearing goggles, a hard hat, and "all kinds of stuff." *Id.* at 32. The plaintiff has not offered any evidence showing why the refusal to place him in an environment with dust and exposure to chemicals was objectively unreasonable.

The testimony and exhibits presented with the motion and response show that Dow made five attempts over several months in an effort to accommodate the plaintiff within his medical restrictions arising from a physical condition that made it difficult for him to work in a

chemical plant. Except for a temporary position, the plaintiff was unable to perform the tasks due to his eye condition. Of the jobs identified by the plaintiff, there is no evidence in the record that he could perform the tasks or that Morgan knew of these potential positions. In other instances, the plaintiff has failed to point to evidence suggesting why the positions are reasonable. The Court concludes, therefore, that the plaintiff has failed to offer evidence sufficient to withstand a summary judgment motion that he was a qualified person with a disability or that the defendant violated its duty to allow a reasonable accommodation that would permit the plaintiff's continued employment there.

### B.

The defendant also moved for summary judgment on the plaintiff's Title VII and Elliott–Larsen claims based on race discrimination. As with the claims under the ADA and PWDCRA, race discrimination claims under Title VII and the Michigan counterpart can be analyzed together because Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to determine whether a claim has been established in discrimination cases. *Radtke v. Everett,* 442 Mich. 368, 382, 501 N.W.2d 155, 162 (1993) (quoting *Sumner v. Goodyear Co.,* 427 Mich. 505, 525, 398 N.W.2d 368 (1986)). For analytical purposes, Michigan's Elliott–Larsen Act resembles federal law, and the same evidentiary burdens prevail as in Title VII cases. *See Sumner,* 427 Mich. at 525, 398 N.W.2d at 376; *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross,* 141 Mich.App. 785, 793 n. 2, 369 N.W.2d 223, 227 n. 2 (1985); *Gallaway v. Chrysler Corp.,* 105 Mich.App. 1, 4–5, 306 N.W.2d 368, 370–71 (1981).

To withstand summary judgment on his Title VII claim, the plaintiff is required either to "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir. 2003). The Court finds that there is no direct evidence of racial discrimination here. The plaintiff has pointed to evidence that he complained about the past conduct of his supervisor, William Moneypenny, but there is no evidence that Moneypenny's treatment of the plaintiff before he learned of the eye condition was racially motivated; only that the plaintiff complained that it was and that the complaint was found to be insubstantial.

In the absence of direct evidence, the plaintiff might prevail if he can establish a circumstantial case of discrimination by first offering evidence of a *prima facie* case, and then, if the defendant offers a nondiscriminatory reason for its actions, showing that the defendant's reasons are a pretext for illegal discrimination. *Carter v. University of Toledo,* 349 F.3d 269, 273 (6th Cir.2003). To make out a *prima facie* case of discrimination, a Title VII plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently from other similarly situated members outside his protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1020–21 (6th Cir.2000) (quoting *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985) (quoting *Parker v. Baltimore and Ohio R.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981))). *See also Zambetti v. Cuyahoga Community College,* 314 F.3d 249, 255 (6th Cir.2002). If the plaintiff cannot produce facts supporting each element of the *prima facie* case, then the defendants are entitled to summary judgment *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 801 n. 7 (6th Cir.1994).

 The "ultimate question" in a disparate treatment case under Title VII remains whether the employer's treatment of the plaintiff was motivated, at least in part, by illegal, intentional discrimination. *See Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination"). That question must be assessed, however, in the context of the actions that the plaintiff alleges were "adverse," and the actors who perpetrated them. An act of discrimination that did not result in action that the plaintiff claims is "adverse" will not provide a basis for recovery; and discriminatory conduct by a non-decision-maker will not be actionable unless there is evidence sufficient to impute that person's racial animus to the defendant employer. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715 (6th Cir.2004).

In this case, the plaintiff alleges that the following adverse actions were committed by Dow because of the plaintiff's race: releasing the plaintiff from his ET position and placing him in the EDTRP in December 2001 rather than reassigning him to a "clean" ET position; repeatedly placing the plaintiff in EDTRP positions that did not meet his medical restrictions; refusing to assign the plaintiff to various posted positions that were within his medical restrictions as required by the collective bargaining agreement; refusing to replace a contract worker with the plaintiff in a position that was within his medical restrictions as set forth in the Medical Restrictions Flowchart; refusing to place the plaintiff on sick leave for thirty-six months and instead terminating his employment in violation of the Collective Bargaining Agreement. *See* Am. Compl. ¶ 57. He alleges that it was Moneypenny that was responsible for placing the plaintiff in the EDTRP. Cal Morgan made the decisions about job placement thereafter, and participated in the decision to terminate the plaintiff.

 As previously noted, however, in proving a circumstantial case, it is the plaintiff's burden to call to the Court's attention evidence that either of these two actors treated the plaintiff differently than similarly-situated employees outside the protected class. *Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). To establish "similarity" of the non-protected class members, the plaintiff is "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998) (quoting *Pierce*, 40 F.3d at 802).

 The plaintiff contends that the following evidence constitutes proof of disparate treatment: (1) Chris Walchak, a medically restricted white employee was placed in a position meeting his medical restrictions and remains in the defendant's employ; (2) Burney Horseman—who suffered from an eye condition—and Shelby Knight, Gary Wright, and Tim Wells, all white and medically restricted employees, were placed and remain employed; and (3) Darrell Dacko, a medical restricted white employee, was not placed but instead remains on medical leave and was not terminated. However, the plaintiff stated at his deposition that he was uncertain as to the what jobs these employees performed, and he could offer only sketchy details of their medical restrictions:

Q: Do you know what their restrictions were?

A: I couldn't quote you verbatim, but you know I have an idea with some of the individuals.

. . .

Q: What was Mr. Chase's medical condition?

A: Like I said having, you know, never talked to him personally I can only tell you what the hearsay was on it.

. . .

Q: What did they tell you?

A: That he had a pacemaker.

Def.'s Mot Summ. J. Ex 2, Jamison Dep. at 105–51. The plaintiff also stated that Mr. Malton had limited use of one arm, Mr. Walchak had "a bad back of some sort," Ms. Knight "had some kind of digestive condition," Mr. Wright "does like a general maintenance thing out at Larkin Lab," Mr. Miles had a bad leg or knee, Mr. Horseman had macular degeneration, and Mr. Dacko "worked in the trades" and had some sort of restriction. *Id.* at 152–160. The plaintiff did not identify the exact positions or job duties of these employees, but did state that some "worked in the trades." *Id.*

Union representative Shanks stated that he knew Mr. Malton was successfully placed while in the temporary pool, he believed Mr. Walchak was not medically restricted, Ms. Knight was medically restricted and he thought she might not be able to work nights, Mr. Miles had a poor knee, Mr. Horseman had a medical restriction, and all are white and still in Dow's employ. Def. Mot. Summ. J. Ex. 17, Shanks Dep. at 18–22. Cal Morgan recalled that once in the time he had been with the Pool he placed James Malton, a white restricted employee who belonged to the union, in a special assignment. Def.'s Mot. Summ. J. Ex. 16, Morgan Dep. at 21. He also stated that he had placed several other white medically restricted employees in temporary positions: Rocky Chase, Chris Walchak, Shelley Knight, and Tim

Miles. *Id.* at 26–27. Another employee, Darrel Dacko, had been in the Pool for a year and currently is on leave with a job waiting for him upon his return. *Id.* at 28.

The deficiency of this evidence is obvious: there is no suggestion that any of these employees suffered from an eye condition—indeed any medical condition—that rendered them hypersensitive to the environment in the defendant's chemical plant. Moreover, there is no evidence that any of these non-minority employees worked in the same or similar position as the plaintiff. The plaintiff was restricted form working in places with dust, fumes, vapors, and strong odors. The very nature of the defendant's manufacturing process produces those precise adverse conditions.

According to Cal Morgan, other employees with medical restrictions were released into the EDTRP so they could be placed in other positions. There is no evidence that the release of the plaintiff into the Pool, whether or not instigated by Moneypenny, was racially motivated. The record reflects that the plaintiff could not work in Building 827 and his doctor instructed that he be removed from that environment. After placement in the EDTRP, the defendant made five different offers of accommodation and only after the plaintiff refused all of them did it terminate his employment. The plaintiff has not offered evidence that creates a material fact issue on whether his treatment at the hands of his employer was different than similarly-situated, non-protected class members.

The Court also finds that Dow's reasons for taking action—that is, its reaction to the plaintiff's medical diagnosis and advice from his physician—rebutted any inference of discrimination that otherwise might be drawn from the other elements of the plaintiff's *prima facie* case, and the plaintiff has not come forward with evidence that those actions were pretextual.

The Court concludes, therefore, that the defendant is entitled to summary judgment on the plaintiff's Title VII and Elliott–Larsen claims.

## III.

The Court finds that the evidence relied upon by the plaintiff in opposition to the defendant's motion for summary judgment on his ADA and PWDCRA claims does not establish a genuine issue on the question of disability or that he is a qualified person with or without a reasonable accommodation. Similarly, the plaintiff has not shown that the defendant's efforts at accommodation were unreasonable. The plaintiff has not established an issue for trial on the question of whether the defendant's actions were motivated by race. The Court concludes that the record taken as a whole could not lead a rational trier of fact to find for the plaintiff.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 18] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.